# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00309

---

LINDA SIM

       Plaintiff,

v.

PBS BRAND CO. LLC D/B/A PUNCH BOWL SOCIAL,
SEASONED DEVELOPMENT, LLC, AND
ROBERT THOMPSON

       Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, Linda Sim, by and through her counsel, GODFREY | JOHNSON, P.C., for her Complaint against Defendant PBS Brand Co. LLC d/b/a Punch Bowl Social ("Punch Bowl Social"), Seasoned Development, LLC ("Seasoned Development"), and Robert Thompson (collectively, "Defendants"), hereby alleges as follows:

1.    This is a classic case of theft and minority shareholder oppression. Defendant Punch Bowl Social lured Linda Sim away from her previous employer with the promise of nearly a million dollars in stock grants that would vest immediately upon commencement of her employment. Simultaneously, Punch Bowl Social was secretly negotiating a $140 million investment from Cracker Barrel Old Country Store, Inc. ("Cracker Barrel") that would give Cracker Barrel a minority stake in the company along with the exclusive right to buy *all outstanding equity interest* in Punch Bowl Social—including the same shares it had just granted to Ms. Sim. In order to close on the deal, Punch Bowl Social forced out Ms. Sim, stole her equity interest, and concealed all of these machinations from her by firing her without warning in an airport Starbucks for what they could only describe as unnamed "legitimate business reasons."

## I. Parties

2.    Plaintiff, Linda Sim, is an individual who resides in, and is a citizen of, the State of Nevada.

3. Defendant, PBS Brand Co. LLC d/b/a Punch Bowl Social ("Punch Bowl Social") is a Delaware limited liability company with its headquarters and primary place of business located at 3120 N. Uinta Street, Suite 300, Denver, Colorado 80238. The members of Punch Bowl Social include citizens of Colorado and Tennessee, but not citizens of Nevada. Accordingly, for jurisdictional purposes, Punch Bowl Social is not a citizen of the State of Nevada.

4. Defendant, Seasoned Development LLC ("Seasoned Development"), is a Delaware limited liability company with its headquarters and primary place of business located at 3120 N. Uinta Street, Suite 300, Denver, Colorado 80238. Upon information and belief, the sole member of Seasoned Development is Robert Thompson, who is a citizen of the State of Colorado. Accordingly, Seasoned Development is a citizen of the State of Colorado.

5. Defendant, Robert Thompson, is an individual who resides in, and is a citizen of, the State of Colorado.

6. Mr. Thompson is the *alter ego* of Seasoned Development because:

   a. Upon information and belief, Seasoned Development is a single-member LLC and Mr. Thompson is its sole member and exercises total control over the entity, and it has no independent management or board. Seasoned Development is merely an instrumentality of Mr. Thompson, and it has no independent existence apart from Mr. Thompson, personally.

   b. Upon information and belief, Seasoned Development is a pass-through entity, and all profits of Punch Bowl Social distributed to it pass directly through to Mr. Thompson, personally.

   c. Because a judgment against Seasoned Development could result in nothing more than a charging order against distributions from Punch Bowl Social, and it has no independent assets of its own, it would represent a manifest injustice not to find that Mr. Thompson is the *alter ego* of Seasoned Development. Accordingly, the interests of justice require finding that Mr. Thompson is the *alter ego* of Seasoned Development.

## II. Jurisdiction and Venue

7. Jurisdiction is proper with this Court pursuant to 28 U.S.C. § 1332(a)(1) based upon diversity of citizenship of the parties. Ms. Sim resides in, and is a citizen of, the State of Nevada; Defendants are citizens of Tennessee and Colorado through the citizenship of their members. Further, the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391, as Defendants are all citizens of the State of Colorado by virtue of individual residency or because one or more of their members are citizens of Colorado. Additionally, Punch Bowl Social's and Seasoned Development's principal places of business are in Colorado and a substantial part of the events or omissions giving rise to the events complained of herein occurred within the state of Colorado.

## GENERAL ALLEGATIONS COMMON TO ALL CLAIMS

9. At all times relevant hereto, Robert Thompson, co-founder and Chief Executive Officer of Punch Bowl Social, and his *alter ego* Seasoned Development LLC, wholly owned by Robert Thompson, were the majority owners of Punch Bowl Social.

10. Upon information and belief, L Catterton, a private equity firm based in Greenwich, CT, held a minority ownership in Punch Bowl Social. On or about July 23, 2019, Cracker Barrel purchased L Catterton's minority ownership in its' entirety and thereby became minority owners of Punch Bowl Social.

11. Linda Sim has over 20 years of experience in the hospitality, sales, marketing, and restaurant industry. From her humble beginnings as a hostess with Outback Steakhouse, Ms. Sim has climbed every rung on the corporate ladder to earn her senior executive title. With companies such as Red Bull and Live Nation Entertainment ("Live Nation") on her resume, Ms. Sim has advanced through the ranks of leadership in her industry and been consistently recognized for her performance and abilities.

12. As a few examples of her recent success, Ms. Sim accomplished a number of career accolades while working with Live Nation. In her first year, Ms. Sim exceeded her target sales by over $500,000 and made company history for the fastest promotion from Director to Vice President of Sales and Events at the national level. While under her leadership, Ms. Sim's division exceeded its growth target by $2,000,000 and achieved the largest margin of growth for the company in the past ten years.

13. On August 22, 2018, while still employed with Live Nation, Ms. Sim was contacted by a recruiter for Punch Bowl Social about a potential sales management position. After learning more about the company, its executives, and the role, Ms. Sim expressed her interest to the recruiter.

14. From September 2018 to December 2018, Ms. Sim went through an extensive interview and vetting process with Punch Bowl Social. Ms. Sim spoke with multiple members of the Punch Bowl Social team and flew to Virginia for an in-person interview with Robert Thompson. Immediately following this in-person interview, Mr. Thompson expressed to Ms. Sim that she was the right candidate and intended to offer her the position.

15. Throughout December of 2018, Ms. Sim and Punch Bowl Social negotiated the terms of her contract. Understanding that Ms. Sim's total compensation at Live Nation was substantially higher than what Punch Bowl Social could offer, Ms. Sim and Mr. Thompson discussed granting Ms. Sim shares of Punch Bowl Social as an incentive to take the job.

16. On December 23, 2018, Punch Bowl Social offered Ms. Sim the position of Senior Vice President of Sales with a $225,000 base salary and uncapped bonus plan of about $100,000 to $175,000.

17. On December 24, 2018, Ms. Sim replied with a counterproposal requesting a change in her title and that Punch Bowl Social grant her shares of preferred stock on her first day of employment in lieu of a higher base salary.

18. Ms. Sim indicated she would be open to discuss a vesting schedule 5,000 units rather than an outright share grant of only 750 units. However, no further discussions on this point between Ms. Sim and Punch Bowl Social ever occurred.

19. Sometime in late December, and in tandem with Ms. Sim's negotiations, Mr. Thompson reached out to Sandra Cochran, the Chief Executive Officer of Cracker Barrel, to open discussions with Cracker Barrel about a future acquisition of the Punch Bowl Social brand.

### A. The Written Employment Offer and Acceptance

20. On January 1, 2019, Punch Bowl Social extended a formal, written offer to Ms. Sim for the position of Executive Vice President of Sales and Events with her employment beginning on February 4, 2019. *See* Employment Contract, *attached hereto* at **Exhibit 1**.

21. The terms of the offer included an annual base salary of $225,000, an uncapped bonus structure as attached to the offer, and a share grant of 750 units ("Share Grant") to be delivered "on the start dae [sic]." *Id.*

22. This formal offer did not include any vesting schedule or contingencies relating to Ms. Sim's Share Grant, and the 750 units were to be given to Ms. Sim outright on her first day of employment. *Id.*

23. On January 2, 2019, Ms. Sim accepted the terms of Punch Bowl Social's formal offer. Ms. Sim signed and returned offer document, thereby creating a contract between the parties (the "Contract" or "Employment Contract"). *Id.*

24. As part of the Contract, Punch Bowl Social also provided Ms. Sim with a prospectus outlining the value of units in the Share Grant (the "Prospectus"). *Id.* at *5.

25. In the Prospectus, Punch Bowl Social outlined three monetization prices per unit, affirmatively stating that the value of each unit in her Share Grant was, alternately, $750, $1,000, or $1,250. *Id.*

### B. Punch Bowl's Negotiations with Cracker Barrel

26. In early January 2019, after Ms. Sim signed her Employment Contract including her Share Grant, but before Ms. Sim resigned from her prior employer and before she began her employment at Punch Bowl Social, Mr. Thompson and Ms. Cochran had an in-person meeting in Ms. Cochran's office at Cracker Barrel headquarters in Lebanon, Tennessee.

27. During the initial meeting, the two CEO's discussed in detail the structure of the deal and the future relationship between Cracker Barrel and Punch Bowl Social after the transaction. On information and belief, Mr. Thompson and Ms. Cochran conversed about Cracker

Barrel's initial acquisition of a minority stake in Punch Bowl Social along with the future option to acquire full ownership.

28.     Despite Ms. Sim's Contract and Share Grant, Punch Bowl Social had now promised to Cracker Barrel the right to purchase the same shares it had already promised to Ms. Sim. Punch Bowl Social never informed Ms. Sim of this fundamental conflict, and, indeed, it intentionally, knowingly, and/or recklessly acted to deprive Ms. Sim of her Share Grant, as valued by the Prospectus, and instead sell her units to Cracker Barrel through the option to purchase Punch Bowl Social outright.

C.  *Ms. Sim's Employment with Punch Bowl Social and The Cracker Barrel Transaction*

29.     Ms. Sim began her employment with Punch Bowl Social on February 7, 2019. Punch Bowl Social failed to deliver Ms. Sim any grant documents on or any time after her start date.

30.     Unknown to Ms. Sim, Cracker Barrel and Punch Bowl Social were engaged in detailed due diligence for their pending transaction, and it was scheduled to close in early July. Accordingly, and in order to facilitate the completion of this transaction, on June 12, 2019, Mr. Thompson and Peter Gaudreau, the then COO of the company, met Ms. Sim at a Starbucks in the Las Vegas airport and abruptly terminated her.

31.     Despite never giving Ms. Sim any feedback, notice, or progressive discipline prior to termination, after her termination Punch Bowl Social executive Robert LeBoeuf claimed in an email that the decision to end Ms. Sim's employment "was made for entirely legitimate business reasons." In fact, she was terminated as part of Punch Bowl Social's scheme to deprive her of her equity units in the company and to facilitate the $140 million investment from Cracker Barrel.

32.     On July 23, 2019, after Ms. Sim was terminated and Punch Bowl Social refused to provide Ms. Sim her Share Grant, Cracker Barrel issued a press release announcing the transaction and its strategic relationship with Punch Bowl Social. Under the terms of the agreement, Cracker Barrel would invest approximately $140 million to acquire its initial non-controlling minority stake with the option to acquire all of the remaining equity interest in Punch Bowl Social in the future. The deal was the largest capital infusion in Punch Bowl Social's history and was directly facilitated by the wrongful termination of Ms. Sim, which provided cover for Punch Bowl Social's theft of her equity units just one month prior.

## COUNT I
### BREACH OF CONTRACT – AGAINST PUNCH BOWL SOCIAL

33.     Plaintiff hereby incorporates all of the allegations in this Complaint as though fully set forth herein.

34.     On January 1, 2019, Punch Bowl Social sent a proposed employment contract to Ms. Sim, and invited her to review this Contract, accept it, sign it, and return it. On January

2, 2019, Ms. Sim signed the Contract and returned a copy to Punch Bowl Social, thereby entering into the employment Contract with Defendant. **Exhibit 1.**

35. The Contract stated that Ms. Sim's employment would begin on February 4, 2019, and that Ms. Sim would receive a "Share Grant" of 750 units in Punch Bowl Social to be "delivered on [her] start da[t]e". *Id.* at 1. These units (the "Units") were offered as an inducement for Ms. Sim to leave her prior employer, Live Nation, where she had a history of not only a high guaranteed salary, but also substantial bonuses in a higher-profile position with a much larger company. This offer only made sense to Ms. Sim because the Units in Punch Bowl Social vested and were owed to her in their entirety on day one of her employment.

36. Ms. Sim began employment with Punch Bowl Social on February 7, 2019, which employment continued until she was abruptly terminated on June 12, 2019. While Punch Bowl Social attempted to foist an illegal and unenforceable severance agreement on Ms. Sim at her termination that would effectively claw back her equity units, she did not accept its terms and did not sign it. As of the date of her termination, Punch Bowl Social had never delivered any grant document to Ms. Sim to sign, and it continues to refuse to do so.

37. Accordingly, Punch Bowl Social breached their obligations under contract to deliver the Units to Ms. Sim, and as a direct and proximate result Ms. Sim has incurred economic damages in an amount to be determined at trial.

## COUNT II
### CIVIL THEFT – VIOLATION OF C.R.S. § 18-4-401, *ET SEQ.* – AGAINST PUNCH BOWL SOCIAL

38. Plaintiff hereby realleges and incorporates all of the allegations in this Complaint as though fully set forth herein.

39. By refusing to deliver to Ms. Sim the Units she owned as of her first day of employment, Punch Bowl Social has retained and exercised control over these Units, a thing of value belonging to Ms. Sim, without authorization.

40. While working to hire Ms. Sim, Punch Bowl Social began negotiations with Cracker Barrel for Cracker Barrel to purchase a minority interest in Punch Bowl Social, with the option for Cracker Barrel to purchase the *entirety* of Punch Bowl Social. This deal closed shortly after Ms. Sim's termination and consisted of Cracker Barrel's purchase for $140 million of (1) a substantial minority interest in Punch Bowl Social, and (2) the future right for Cracker Barrel to purchase all remaining units of Punch Bowl Social at its election. Punch Bowl Social specifically intended to permanently deprive Ms. Sim of her ownership Units in Punch Bowl Social because, among other reasons, this would facilitate its deal with Cracker Barrel without needing Ms. Sim to participate in the negotiations, agree to the deal, or share in the resulting profits and increased post-money valuation.

41. Accordingly, Punch Bowl Social's actions constitute Civil Theft as set forth in C.R.S. § 18-4-401, *et seq. See, e.g., Ziegler v. Inabata of America, Inc.*, 316 F. Supp. 2d 908, 915-

916 (D. Colo. 2004) (Issues of fact regarding whether corporation intended to permanently deprive terminated employee of promised stock ownership precluded summary judgment on civil theft claim) (Kane, J.).

42. As a direct and proximate result of this theft, Ms. Sim has been damaged in an amount to be determined at trial.

## COUNT III
### PROMISSORY ESTOPPEL – AGAINST PUNCH BOWL SOCIAL AND ROBERT THOMPSON

43. Plaintiff hereby realleges and incorporates all of the allegations in this Complaint as though fully set forth herein.

44. Ms. Sim asserts this claim *in the alternative* to her claim for breach of contract, above.

45. Punch Bowl Social, by and through its CEO and member Robert Thompson, made a promise to Ms. Sim that they would grant her the Units upon her first day of employment.

46. Punch Bowl Social and Robert Thompson reasonably should have expected, and indeed did expect, that this promise would induce Ms. Sim to act in reliance upon it. Ms. Sim did act in reliance upon this promise to her detriment by leaving her higher-profile job at Live Nation and accepting the offered position at Punch Bowl Social.

47. This promise must be enforced to prevent injustice, and accordingly damages must be paid to Ms. Sim in an amount to be determined at trial.

## COUNT IV
### SECURITIES FRAUD – VIOLATION OF THE COLORADO SECURITIES ACT, C.R.S. § 11-51-501 – AGAINST PUNCH BOWL SOCIAL AND ROBERT THOMPSON

48. Plaintiff hereby realleges and incorporates all of the allegations of this Complaint as though fully set forth herein.

49. Ms. Sim asserts this claim *in the alternative* to her allegation above that Punch Bowl Social units were worth $1,250 each (based upon statements in the Prospectus). Should Defendants argue that the measure of damages owed to Ms. Sim cannot be calculated based on this valuation of $1,250 per unit, Plaintiff asserts that the valuation of $1,250 per unit in the Prospectus constituted the communication of a material misrepresentation as to the value of the Units, and that Defendants therefore made a material representation to Ms. Sim in the sale of these securities constituting securities fraud as set forth herein.

50. Punch Bowl Social, in its Prospectus sent by its CEO Robert Thompson, and in connection with the sale of securities (the Units) to Ms. Sim as part of the Contract, made a material misstatement that each unit of ownership was worth $1,250. In fact, Punch Bowl Social and Mr. Thompson knew at the time they provided the Prospectus that these units were not worth anywhere near $1,250, and they made this misrepresentation with the specific intent

that Ms. Sim would rely on it and accept the employment Contract as a result of these inflated numbers.

51. Punch Bowl Social, in its Prospectus sent by its CEO Robert Thompson, and in connection with the sale of securities (the Units) to Ms. Sim as part of the Contract, made a material misrepresentation and/or omission by concealing from Ms. Sim that Punch Bowl Social was in negotiations with Cracker Barrel, and that they intended to sell to Cracker Barrel the same securities they were purporting to offer to Ms. Sim. In fact, Punch Bowl Social and Mr. Thompson knew, upon information and belief at the time it provided the Prospectus and offer of the grant of the Units, and certainly before Ms. Sim began her employment, that this offer was wholly illusory, and that they would not and could not provide these securities to Ms. Sim as they were being offered, instead, to Cracker Barrel.

52. Punch Bowl Social and Mr. Thompson made this misrepresentation, or, in the alternative, failed to correct this incorrect and deceptive material statement in the Prospectus prior to Ms. Sim giving notice to Live Nation and before the commencement of her employment, with the specific intent that Ms. Sim would rely on, or continue to rely on, her belief that she would be granted these Units, and that she would leave her prior position to work at Punch Bowl Social as a result. As part of its negotiations and attempts to lure Ms. Sim away from Live Nation, Punch Bowl Social had an affirmative duty to disclose these facts to Ms. Sim, as well as the affirmative duty to correct statements that it knew *became* materially false as the parallel negotiations with Cracker Barrel progressed.

53. Ms. Sim relied on these misstatements and omissions to her detriment by leaving her higher-profile job at Live Nation to enter into the employment Contract with Punch Bowl Social. These misstatements and omissions were the direct and proximate cause of Ms. Sim suffering economic loss in an amount to be determined at trial.

## COUNT V
**FRAUD IN THE INDUCEMENT – AGAINST PUNCH BOWL SOCIAL AND ROBERT THOMPSON**

54. Plaintiff hereby realleges and incorporates all of the allegations of this Complaint as though fully set forth herein.

55. Ms. Sim asserts this claim *in the alternative* to her claim of breach of contract, above.

56. Defendant Robert Thompson, as a member of and CEO of and on behalf of Punch Bowl Social, affirmatively represented to Ms. Sim in his communication of the proposed Contract that he and Punch Bowl Social could and would deliver to Ms. Sim the Units on her first day of employment. This representation was material as it was a key negotiated term in her agreeing to leave her job at Live Nation and accept the position at Punch Bowl Social.

57. This representation was false at the time it was made, and Mr. Thompson and Punch Bowl Social knew that it was false, that they did not intend to follow through on this

promise, and that they could not follow through on this promise because Mr. Thompson intended to sell these Units to Cracker Barrel.

58. Mr. Thompson and Punch Bowl Social made this representation with the specific intent that Ms. Sim would rely on the representation to her detriment by leaving her job at Live Nation and accept the offer of employment as set forth in the Contract to work for Punch Bowl Social. In reliance on this representation, and to her detriment, Ms. Sim left her job at Live Nation and was fraudulently induced to enter into the Contract.

59. As a direct and proximate result of this fraudulent inducement, Ms. Sim suffered economic and noneconomic damages by leaving a higher-profile job and never receiving the promised Units, in an amount to be determined at trial.

## COUNT VI
### BREACH OF FIDUCIARY DUTIES – MINORITY OPPRESSION – AGAINST SEASONED DEVELOPMENT, LLC AND ROBERT THOMPSON

60. Plaintiff hereby realleges and incorporates all of the allegations of this Complaint as though fully set forth herein.

61. Pursuant to the Contract, Ms. Sim was the owner of 750 units of Punch Bowl Social as of no later than February 7, 2019. This constitutes a minority stake in the company.

62. Punch Bowl Social is a closely held entity, which is majority owned by, upon information and belief, a control group (the "Control Group") previously consisting of Seasoned Development LLC and its *alter ego* and founder Rob Thompson. Since the closing of the equity and purchase option deal with Cracker Barrel on or about July 23, 2019, Cracker Barrel has also become part of this Control Group.

63. From no later than February 7, 2019 until present, this Control Group has owed fiduciary duties of care, candor, and loyalty, among others, to Ms. Sim as a minority member. These duties arise independently of the Contract and are not addressed in any way in the Contract. Because of the dramatic disparity between the ownership share and control wielded by the Control Group, and that of Ms. Sim, these fiduciary duties are particularly heightened under the instant circumstances.

64. Without any regard for the best interests of Ms. Sim, and acting solely in their own best interest and to the detriment of Ms. Sim, this Control Group intentionally, knowingly, and/or recklessly breached its fiduciary duties to Ms. Sim by, among other things:

   a. Theft of and/or retaining control over Ms. Sim's Units in Punch Bowl Social to their benefit and to the detriment of Ms. Sim, in breach of their duties of loyalty and good faith, and for the insider purpose of facilitating their own financial gain through the Cracker Barrel deal;

9

    b. Concealing from Ms. Sim the negotiations with, and terms of, the deal with Cracker Barrel, including that there was a fundamental conflict between Ms. Sim's Units and the promise that Cracker Barrel would be granted an option to purchase *all* Units;

    c. Failure to make to Ms. Sim distributions of profits made by Punch Bowl Social;

    d. Terminating Ms. Sim, not for any actual documented cause or business justification that could even potentially justify this breach of their duty of loyalty, but merely in order to benefit the Control Group by squeezing Ms. Sim out of ownership to facilitate the Cracker Barrel deal and increase their own financial gain. In fact, as Ms. Sim was a minority member to whom duties of loyalty were owed, and she was therefore no longer an at-will employee, her unjustified termination itself was a breach of these duties. Accordingly, Ms. Sim has additionally been deprived of her ongoing salary, bonus, and profit distributions.

65. All of these actions constituted willful, wanton, reckless, knowing, and intentional breaches of the Control Group's fiduciary duties to Ms. Sim, which directly and proximately caused her economic and noneconomic losses in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants on all the claims set forth herein, as follows:

    a. Entry of judgment in her favor for economic damages sustained as a result of Defendant's breach of contract, or, in the alternative, for her reliance damages under her claim for promissory estoppel;

    b. Entry of judgment in her favor for three times the amount of economic damages sustained as a result of Defendant's civil theft pursuant to C.R.S. 18-4-401, *et seq.*;

    c. Entry of judgment in her favor for economic damages sustained as a result of securities fraud and common law fraud under state law, as set forth above;

    d. Entry of judgment in her favor for economic damages sustained, and disgorgement of profits earned, as a result of Defendants' actions in breach of their fiduciary duties;

    e. An award of pre- and post-judgment interest at the maximum rate allowable by law;

    f. An award of attorney fees and costs incurred in bringing this action as authorized by C.R.S. 18-4-401, *et seq.*, common law fraud claim, common law breach of fiduciary duty claim, the Colorado Securities Act, and any other basis in statute or law; and

    g. Any such other and further relief as this Court may deem proper under the circumstances.

    h. Plaintiff reserves the right to amend the Complaint to seek punitive damages on her claims of fraud and minority oppression.

PLAINTIFF DEMANDS TRIAL TO A JURY OF ALL CLAIMS SO TRIABLE

Respectfully submitted this 5th day of February 2020.

                                                                       GODFREY | JOHNSON, P.C.

                                                                       */s Jeffrey Vail*
                                                                       Jeffrey Vail
Brett Godfrey
Maddin Nelson
9557 S. Kingston Court
Englewood, Colorado 80112
Phone: (303) 228-0700
Fax: (303) 228-0701
Email: vail@gojolaw.com
Email: godfrey@gojolaw.com
Email: nelson@gojolaw.com
*Counsel for Plaintiff*